**John Dayton WRIGHT and Jacob Christopher Martin, Sr.,**
**Plaintiffs–Appellants,**

v.

**SEARS, ROEBUCK AND CO.,**
**Defendant–Appellee.**

No. 02–5562.

United States Court of Appeals, Sixth Circuit.

Nov. 10, 2003.

Margaret L. Behm, Anne C. Martin, Dodson, Parker, Dinkins & Behm, Nashville, TN, for Plaintiffs–Appellants.

William N. Ozier, Bass, Berry & Sims, Nashville, TN, Marcia E. Goodman, Maritoni D. Kane, Charles N.W. Keckler, Joshua D. Yount, Mayer, Brown, Rowe & Maw, Chicago, IL, for Defendant–Appellee.

Before MERRITT, MOORE, and GILMAN, Circuit Judges.

MERRITT, Circuit Judge.

The two plaintiffs, former store general managers for Sears, appeal a grant of summary judgment for Sears on their claims that they were fired in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 and the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001–1146. Without having to consider the question of whether a prima facie case was made on age discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003) (en banc), we agree with the district court that plaintiffs failed to create a genuine issue of material fact that would justify a trial on the question of whether Sears' stated reason for the firings was pretextual. Plaintiffs' claim under ERISA fails for similar reasons. We therefore affirm the district court's grant of summary judgment for defendant. The case is highly fact intensive and requires a detailed review and analysis of the record.

## I. AGE DISCRIMINATION

### 1. *Plaintiff Wright*

Wright worked for Sears for 25 years, starting in 1973 until his termination in November 1998. He was promoted to store general manager in 1989 and held that position until his termination. Prior to the arrival of Ron Ford as the district general manager in mid–1997, Wright had never received a "performance plan for improvement." Ford issued the plan to Wright in February 1998, based on visits to Wright's store, comments from store staff and communications with district and regional staff that had visited the store. The "performance plan" cited concerns about poor housekeeping and inadequate merchandise displays. In May 1998, Wright received his annual performance review, which concluded that Wright was either not meeting or only partially meeting expectations in the rated areas. Ford particularly stressed to Wright that Wright's leadership skills were lacking and were a primary cause of the low ratings. Wright disputed these ratings because he was meeting expected numeric goals as to growth and profits for his store and therefore, based on these figures alone, believed he warranted higher ratings under Sears' rating system. It is undisputed that Wright's store profits were among the highest in the district.

At the end of October 1998, Ford issued a second "performance plan" to Wright, stating that Wright had not improved upon those areas identified in the first plan and he would be terminated in 30 days if he failed to improve. The performance plan

stated that Wright still was not keeping the store neat enough and merchandise presentation was below standard. Wright was terminated before the 30 days passed because he failed to meet or make progress towards the objectives stated in both performance plans, particularly, according to Ford, with respect to leadership abilities. Both the vice-president for the South Central Region, Teresa Byrd, and the Regional Human Relations Manager, Diane Franzese, concurred in Ford's decision to terminate Wright based on first-hand knowledge of Wright's shortcomings as a store general manager. Byrd and Franzese had both visited the store and observed various problems with the physical appearance of the store, as well as Wright's resistance to change and lack of leadership skills. The termination was also approved by Michael Bass, the Director of Field Human Resources, based on documentation provide to him concerning Wright. Wright was 49 when he was terminated in November 1998.

Wright was replaced by Peter Miller, age 55. Miller was transferred from another store and a management trainee, age 41, replaced Miller at Miller's former store. Miller transferred to the Murfreesboro store six months later and was replaced at Cool Springs by a 43 year old.

The record is replete with evidence from many of Wright's superiors at both the district and regional levels that he was not performing adequately under Sears' standards. Ford's deposition testimony has many specific examples of his assessment of Wright's performance. Ford testified that his primary complaint with Wright was Wright's lack of leadership skills and his unwillingness to address the problem. Ford Dep. at 21–23, J.A. at 462–64. In addition, the performance plan also sets out the areas where Wright was not adequately performing, including his reluc-

tance to be involved in merchandising, his favoritism of certain store employees and the generally poor housekeeping at the Cool Springs store. J.A. at 224–25.

As for other Sears' managers opinion, Diane Franzese, the human resources manager for the region, testified that Wright struggled with the changes in methods and operations Sears was requiring of its store managers and that he was not making any attempt to change his performance to meet the standards set out in his performance plan. Franzese Dep. at 205–06, 211 J.A. at 492–94. Teresa Byrd, the regional vice-president, also testified that she had personally observed some of the problems listed in Wright's performance plan during her visits to his Cool Springs store, including his lack of customer service and resistance to change in the operation of the store. Byrd Dep. at 111–12, J.A. at 379–80.

Franzese also testified that she had conversations with John Columbo, the district general manager just before Ford, about Wright's poor job performance during Columbo's tenure as Wright's immediate supervisor. She testified that she and Columbo had discussed putting Wright in a different position at a different store but nothing suitable was available at the time. Franzese Dep. at 275, J.A. at 499.

Robert Schumacher, a manager with Sears district team, sent a memo to district general manager Ford in December 1997 after Schumacher visited the Cool Springs store with Bill Koenig, the regional director in charge of visual merchandising for Sears. The memo describes the condition of the store as "messy," with "stuff" pulled out of the stock room and piled around the store haphazardly. Memo from R. Schumacher to R. Ford, Dec. 21, 1997, J.A. at 233. That same visit to the Cool Springs store prompted a memo from Bill Koenig to Ron Ford

wherein Koenig stated that his "overall impression of the store was that it was doing business in spite of itself." Memo from B. Koenig to R. Ford, Dec. 19, 1997, J.A. at 237.

Doug Shields was the human resources manager for the Memphis District during part of Wright's tenure as store general manager at Cool Springs. He testified that Wright did not adequately deal with human resources issues in his store and that Shield's predecessor in the district human resources position, Sherrie O'Keefe, also believed that Wright failed to address performance issues with the sales managers in his store. Shields Dep. at 319, J.A. at 600. Sherrie O'Keefe also reported that several of the subordinate managers at the Cool Springs store were "terrified" of retaliation by Wright because he played favorites among the store staff. Memo from O'Keefe to Ron Ford, Nov. 10, 1997, J.A. at 240.

Shields also testified that Wright's communication with both his store staff and the district team was "not as good as it could have been" and that required training was not completed by certain sales managers, which led to communication problems. Shields Dep. at 357–60, J.A. at 607. Shields testified at length about Wright's lack of leadership skills and his focus on his "numbers" instead of skills. Shields explained that Sears has been undergoing a "culture change" for at least a decade and store managers are now taught to work on their leadership skills and not worry about the "numbers" because Sears believes that the numbers will fall into place if the leadership skills are present. Shields Dep. at 362–64, J.A. at 608. This corroborates Ford's testimony that he viewed leadership skills as the most important component of a store general manager's overall performance—rating it more important than sales numbers and other objective factors.

Wright complains that, in making factual findings about his job performance, the district court gave only "passing reference" to the objective performance ratings he received while giving "great weight" to the subjective comments of Ford and Byrd. Plaintiffs' Brief at 7, 28. Wright ignores the number of these "subjective" comments and the wide array of managers from which they come. The record documents Sears' defense concerning Wright's substandard performance over a number of months, as noted by many Sears managers at both the district and regional levels, and it documents the claim that Wright failed to improve despite being told in detail the areas that needed improvement.

### 2. *Plaintiff Martin*

Martin began working for Sears in 1970 and became a store general manager in Columbia, Tennessee, in 1989, where he remained until his termination in 1999. Prior to 1997, Martin had never received any written warnings about his performance at Sears. Martin received his first performance plan from Ford in February 1998. The performance plan cited lack of leadership, housekeeping problems and lack of communication with store and district staff. Martin was given 60 days to improve. Martin disputed the bases for the warning, citing store data that showed the store to be profitable and in line with expectations for that store. Martin received his annual performance review in May 1998, receiving ratings that reflect that he was either not meeting expectations or was only partially meeting expectation in all areas evaluated. In October 1998, Martin received his second performance plan, which indicated that he had not corrected most of the problems identified in the first plan. Martin was terminated

in January 1999 for unsatisfactory performance, particularly lack of leadership skills and failure to meet company standards. Ford's superiors in the district and regional offices concurred in Ford's decision. Martin was 50 years old at the time of his termination. A 37 year-old replaced Martin as store general manager at the Columbia store.

The record amply demonstrates Sears' defense that it had a legitimate, nondiscriminatory reason for terminating Martin as well. For example, Teresa Byrd, the regional vice-president, visited the Columbia store in November 1997 and stated that she was distressed with the overall look of the store, regarded it as below Sears' standards and told Martin that "she didn't want to see the store like that again." Martin Dep. at 62, J.A. at 544. She also testified that Martin's "leadership skills were ranked very low by his sales managers and the district team." Byrd Dep. at 117, J.A. at 385. She testified as to her personal knowledge of problems listed in Martin's performance plan as well, including "lack of communication, no sense of urgency, ... no leadership or coaching, stock areas remained cluttered and crowded, attention to detail, housekeeping standards." Byrd Dep. at 115–16, J.A. at 383–84.

Diane Franzese, the regional human resources manager, also testified about the shortcomings in Martin's performance. She gave her opinion that Martin is simply "not a merchant"—meaning he doesn't know how to "get, place or sell merchandise." She testified that he did not like conflict and couldn't address difficult personnel and business issues that arose in the store. In sum, she testified that Martin was "just over his head" in the store general manager position and was not able to bring his performance up to the necessary level. Franzese Dep. at 314, 344, 362, J.A. at 504, 509, 513. She also testified that the Columbia store was a mess and that Martin did not seem able to fix the problem. Franzese Dep. at 346, J.A. at 511.

In a memo from Robert Schumacher of the district staff to Ron Ford concerning a pre-Christmas visit to the Columbia store by Bill Koenig, the regional visual manager, Schumacher noted that "attention to detail is something the store really needs to work on. (standards)," and went on to list several items that needed attention in the store, as well as describing the main aisle in home improvement as "very messy," "obviously not planned out" and needing "a whole lot of attention and merchandising work." Schumacher said the stacks "made no sense." Memo from R. Schumacher to R. Ford, Dec. 20, 1997, J.A. at 238–39.

Doug Shields, the district human resources manager during part of Martin's tenure as store general manager, testified that there were many human resources problems that were not being addressed at the Columbia store, including hiring for rush seasons, lack of leadership and failure to train sales associates. Shields Dep. at 325–27, J.A. at 602. He described the atmosphere, from a human resources perspective, as "negative." Shields Dep. at 334, J.A. at 604. Shields also testified that the Columbia stockroom was a "wreck" when he made in-store visits. *Id.*

3. *Whether Sears' Stated Reasons*
*for Terminating Plaintiffs*
*Were Pretextual*

 Because Sears has articulated legitimate, nondiscriminatory reasons for firing plaintiffs, the next issue with which we are confronted under the *McDonnell Douglas* framework is whether plaintiffs presented sufficient evidence to create a genuine issue of material fact concerning whether

Sears' proffered reasons for the terminations were a pretext for discrimination. Pretext can be established by (1) a direct evidentiary showing that a discriminatory reason more likely motivated the employer or by (2) an indirect evidentiary showing that the employer's explanation is not credible. Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. To avoid summary judgment, the plaintiff is required to produce evidence that the employer's proffered reasons were factually untrue. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

Plaintiffs attempt to demonstrate pretext by showing that they received favorable reviews as well as unfavorable reviews, arguing that these conflicting reviews create an issue of fact as to whether they were actually performing below expected levels. Plaintiffs' evidence consists of favorable affidavits from sales associates who worked for plaintiffs in their respective stores and from former district general managers who supervised plaintiffs. Affidavits of subordinates, such as the sales associates who worked for Wright or Martin, do little to rebut Sears' proffered legitimate business reason. These affidavits merely show that plaintiffs had good rapport with some of their subordinates. The record also demonstrates that some store associates did not believe that plaintiffs were doing a good job. *See, e.g.,* Memo from O'Keefe to Ron Ford, Nov. 10, 1997, J.A. at 240 (Sherrie O'Keefe reported that several of the managers at the Cool Springs store were "terrified" of retaliation by Wright because he played favorites among the store staff.).

Likewise, affidavits from prior district store managers do not demonstrate that plaintiffs are meeting the current expectations of the position, which expectations may have changed over time or with new management. The affidavits do not rebut the employer's proffered reasons for not retaining plaintiffs in the store general manager position, nor do they call into question the veracity of Sears' justification. What may have satisfied one management regime does not necessarily satisfy its successor, and plaintiffs' proffered evidence does not serve to rebut Sears' current management's views regarding plaintiffs' insufficient skills to continue in the store general manager position. Tellingly, Teressa Byrd, the regional vice-president, testified that one of the reasons Ford was brought in as a new district manager was to help identify and assess the current pool of store general managers in the Memphis District. Byrd Dep. at 101, J.A. at 372 ("I needed a leader in that market [who] could accurately assess the talent and strength of the store general [mangers]".) Therefore, in order to rebut, or undermine the credibility of, Sears' contentions that plaintiffs lacked competency in vital areas, they would need to offer proof that they were indeed proficient in these areas *according to the new management or supervisor.* Plaintiffs' evidence at most illustrates the "clash of cultures" between the old and the new management styles as explained by Doug Shields of the district human resources department.

Plaintiffs also point to the fact that many of the objective criteria on which they were rated were more than satisfactory, even after district store manager Ford arrived. This is true. Both plaintiffs met

or exceeded goals for sales, employee retention and other measurable touchstones of retail sales. Plaintiffs claim that this disparity in their "subjective v. objective" ratings creates conflicting "facts" about their performance that put Sears' credibility at issue, requiring a jury trial. However, meeting or even exceeding certain minimum requirements or baseline standards set by the company will not guarantee that an employee, especially a manager, is achieving the overall goals of the company. This is the prerogative of the company. The federal courts do not sit to assess the general fairness of an employer's treatment of long-time employees, but only to apply statutory standards. As we have stated in the past, the discrimination laws do not "require employers to make perfect decisions, nor forbid them from making decisions [with which we may disagree]. Rather, employers may not hire, fire or [fail to] promote for impermissible, discriminatory reasons." *Hartsel v. Keys,* 87 F.3d 795, 801 (6th Cir.1996).

As another indication of pretext, plaintiffs assail Ford's credibility and attempt to discredit his assessments and opinions of plaintiffs because Ford resigned after allegations that he falsified his expense reports. The reason Ford resigned is unrelated to plaintiffs or with his performance as their supervisor. Even if plaintiffs were able to raise legitimate questions about Ford's credibility and discredit all of his testimony, plaintiffs have not raised legitimate questions about all of the other evidence summarized above or about the legitimacy of Sears' stated reasons for the terminations. The record makes clear that many other managers believed plaintiffs should be discharged as store managers.

Naturally, much of the documentation of plaintiffs' poor performance came from Ford because he was plaintiffs' immediate supervisor. However, the problem areas with plaintiffs were repeated in subjective comments by numerous managers at both the district and regional management levels at Sears, many with first-hand knowledge of the problems after store visits. These were not isolated comments or the comments and opinions of only Ford. Other evidence comes from reports and feedback from all levels of Sears' personnel. Both before and after Ford was hired, there were many instances where senior management also had doubts about the performance of some of its store general managers, including plaintiffs Martin and Wright. Teresa Byrd, the regional vice-president, also testified that Wright's previous district general manager, John Columbo, was "disappointed" in Wright's performance. Byrd Dep. at 155–56, J.A. at 400–01. In a review of Martin shortly before Ford became the district general manager, Columbo noted that Martin needed to work with district staff more closely on merchandising, develop better relationships with his store staff and train his staff better. 1996 Performance Review, J.A. at 131–37. During her deposition testimony, Byrd explained that her assessment of store general managers came from reviewing various reports by Sears' personnel at all levels, from the store level up to the regional level, and through in-store visits by her and fellow district and regional managers. Byrd Dep. at 117, J.A. at 385. All levels of regional and district staff participated either directly or indirectly in reviewing store general managers. Ford Dep. at 13, 29–32, 37–39, J.A. at 460, 466–67 (explanation of how various managers throughout Sears management hierarchy would have input into store general manager reviews and performance plans for improvement).

The performance plans for Martin and Wright were drafted by Ford, regional human resources manager Franzese, and

regional vice-president Byrd, with written or verbal input from many district and regional managers. Ford Dep. at 29, J.A. at 466. Ford also explained that the decision to terminate was not made based on the views of a single person. Ford explained that while the ultimate decision to terminate would be made by human resources staff, input on performance plans and the decision to terminate would be the result of the accumulation of the observations of many members of the district and regional team. Ford Dep. at 39, J.A. at 467. Plaintiffs give more weight to the "numbers" as objective measurements of plaintiffs' performance because they are "outside of Sears management's control." Plaintiffs' brief at 28. Sears managers testified again and again that certain skills were more important than "numbers." In light of Sears' stated change in "corporate culture" over the last ten years, Sears' explanation that the company was now emphasizing leadership skills in its management team more than sales quotas is credible.

Lastly, in an effort to rebut Sears' articulated reasons for termination, plaintiffs also presented statistical evidence that the age of store general managers in the Memphis District during Ford's tenure substantially decreased. When Ron Ford became the district general manager for the Memphis District in June 1997, there were 19 store general managers in the district. The average age of the store general managers was 46.97 years and the median age was 49.48 years. Fifteen store general managers were over age 40 and four store general managers were under age 40. In January 2000, shortly after Ford left Sears, the average age of the store general managers was 46.2 years and the median age was 48.11 years. Seventeen of the 21 store general managers in the Memphis District (two stores had been added since 1997) were over 40. These numbers reflect no significant change in the overall age distribution of store general managers in the Memphis District during Ford's tenure. No matter how plaintiffs wish to present the numbers, we see no statistical evidence of impermissible age discrimination in this case. There is virtually no difference in the number of employees under 40 between June 1997 (4 out of 19 or 21%) and January 2000 (4 out of 21 or 19%). In fact, Sears opened two new stores in the Memphis District during that time and both store general managers hired for the positions were over 40. The number of managers over 40 remained constant during this period or increased.

## II.

### ERISA CLAIMS

■ Plaintiffs claim that they were discharged so that Sears could save money on pensions in violation of ERISA. ERISA makes it unlawful for an employer to "discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary [of an employee benefit plan] . . . for the purposes of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. To make out a prima facie case under this section, a plaintiff must show (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which an employee may be entitled. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir.1997). Like the burden-shifting analysis used in age discrimination cases, an employer can refute a prima facie case by introducing "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Id.* "This shifts the burden back to the plaintiff to show that the employer's proffered reason was mere pretext. Although the plaintiff need not show that the employer's sole purpose . . . was to interfere with plaintiff's entitlement to benefits,

he must either prove that the interference was a motivating factor in the employer's actions or prove that employer's proffered reason is unworthy of credence. Summary judgment is appropriate if plaintiff fails to establish a prima facie case or fails to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions." *Id.* The plaintiff must show that the employer had a specific intent to violate ERISA. Proximity to vesting and a showing of cost savings is not sufficient, standing alone, to entitle plaintiff to a trial.

Sears' employee pension plan is entirely employee funded. At age 55, Sears employees who have over five years of service become fully vested in the pension plan. Wright, who was terminated after 24 years of service at age 49, will receive an estimated monthly pension payment of $734.89 when he turns 55. If he had continued to work at Sears until age 55, the monthly payment would have increased to $1,309.80 or he would have been entitled to a one-time, lump-sum payment of $197,959.79. Wright is now ineligible for the lump-sum payment.

Martin was terminated at the age of 50 after 28 years of service. Martin will receive a monthly payment of $705.85 once he turns 55. If he had continued to work for Sears until he was 55, his monthly payment would have been $1,148.06 or he could have received a one-time, lump-sum payment of $173,558.61. Like Wright, he is now ineligible for the lump-sum payment.

Nothing in the record supports plaintiffs' claim that they were discriminated against because they would be eligible for early retirement benefits in *five or six years*. Such a lengthy period of time is too remote from retirement to serve as an indicator of improper motive without more. *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1044 (6th Cir.1992). Furthermore, several other store general managers in the Memphis District were closer to the early retirement age of 55 than plaintiffs and they were not terminated. At least four of them retired within a year of plaintiffs' termination and received their full benefits. Plaintiffs have not offered any evidence that Sears fired them because it wanted to save money in pension payments in violation of ERISA.

For the foregoing reasons, the judgment of the district court is affirmed.

MOORE, Circuit Judge, dissenting in part.

Because I believe that plaintiffs presented evidence demonstrating a genuine issue of material fact whether Sears's asserted nondiscriminatory reasons for firing plaintiffs were pretextual, I would reverse the district court's grant of summary judgment on the age discrimination claims. I respectfully dissent on that basis.