NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0620n.06

No. 12-5384

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jul 02, 2013*
DEBORAH S. HUNT, Clerk

SPENCER J. CARTER, III, )
)
    Plaintiff - Appellant, )
)
v. )
)
TOYOTA TSUSHO AMERICA, INC., )
)
    Defendant - Appellee. )
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

---

**BEFORE:  WHITE and DONALD, Circuit Judges; VARLAN, Chief District Judge.**[*]

    **HELENE N. WHITE, Circuit Judge.**  Plaintiff Spencer J. Carter, III (Carter), appeals the district court's grant of summary judgment in favor of his former employer, Defendant Toyota Tsusho America, Inc. (TAI), dismissing Carter's race- and age-based employment discrimination claims brought under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e–2(a)(1), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), and the Kentucky Civil Rights Act (KCRA), Ky. Rev. Stat. Ann. § 344.040(1).  We AFFIRM.

---

[*]The Honorable Thomas A. Varlan, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

**I.**

**A.**

**1.      TAI hires Carter to manage its information technology department**

TAI supplies steel and related materials to the car manufacturing industry.  Prior to joining TAI, Carter had nearly twenty years of management experience in information technology (IT).  One of TAI's officers, William Wiener, interviewed Carter for employment and recommended him for hire.  In January 2002, TAI hired Carter as the general manager of its IT department, based at TAI's Georgetown, Kentucky location.  In this position, Carter was "responsible for directing, organizing, planning and controlling the IT [d]epartment in accomplishing TAI goals and objectives across all locations.  This include[d] coordinating with and guiding other departments to achieve the most productive and cost effective solutions to their IT projects."  Carter's leadership position required him to manage the day-to-day operations of the department.  As Carter confirmed at his deposition, the position also required him to have a vision to translate TAI goals and objectives into action.

Shortly after TAI hired Carter, Wiener became the company's chief operating officer and Carter's direct supervisor.  Wiener acted as Carter's supervisor until December 2007, which is when Carter began indirectly reporting to Wiener through Larry Keiser, the supervisor who ultimately recommended Carter's termination to Wiener.

Wiener's office was based in New York and he traveled to Georgetown on a monthly basis.  According to Carter, Wiener rated his job performance as meeting expectations or better.  However, Wiener testified that he had given Carter only "midline" ratings on performance reviews, and stated that Carter had not met the company's expectations for several years.

TAI did not produce written reviews that Carter alleges exist. TAI maintains that such written reviews never existed. Carter thus points to his salary increases as evidence that he met or exceeded company standards. Under TAI performance standards, employees are rated as outstanding, exceeding expectations, meeting expectations, or below expectations. An employee's salary increase is determined based on a weighted formula that takes into account the score from the employee's individual performance rating, as well as ratings for that employee's section and the overall company rating. For IT employees, the individual rating (consisting of an alpha or numeric score issued by the employee's supervisor) has the most weight.

Carter started at TAI with an annual salary of approximately $110,000. From 2003 to 2007, Carter received the following annual percentage increases in his salary:

2003:  5.00 percent ($115,499.80)
2004:  3.45 percent ($119,483.936)
2005:  3.61 percent ($123,800.04)
2006:  3.30 percent ($127,885.47)
2007:  3.50 percent ($132,361.01)

Under company guidelines, employees who perform below exceptions would receive salary increases of about two percent or less. By contrast, employees evaluated as exceeding expectations would be entitled to a 3.6 to 4.4 percent salary increase, with a 3.5 percent target increase for all employees meeting expectations.

## 2.     Executive coaching

In early 2007, Wiener referred Carter to an outside consultant, Lisa Morgan, for executive coaching. Morgan testified that TAI paid about $10,000 for the six-month program, the coaching for Carter was not punitive, and a company does not usually invest in coaching unless it feels that

the employee will be part of its future. The coaching program has two phases: assessment and development. During the assessment phase, Morgan conducted a 360 Degree Feedback Evaluation Report (360 Report or the report) regarding Carter's leadership practices based on responses from Wiener, as well as Carter's colleagues and subordinates. The report indicated that Carter's weakest skills involved "strategy integration with visioning, strategic thinking, and managing change." Morgan testified that vision and strategy were very important skills for Carter to develop to be an effective manager. Further, Morgan stated that the report revealed a "significant gap" between how Carter viewed himself and how his coworkers viewed him. Carter rated himself higher than Wiener and his coworkers rated him on questions regarding leadership, building relationships, results orientation, and strategy. Although Carter received some positive feedback from coworkers on the report's open-ended questions, the report also included the following feedback as suggestions for Carter to be more effective: "team builder"; "be more decisive"; "provide leadership in how to improve the overall organization with IT technology advances"; "communicate more with staff"; "pay careful attention to morale issues"; "gives the 'impression' that he has his best interest in mind rather than the department"; "higher focus on leadership"; and "better execution of projects and special requirements."

Following the assessment, Carter and Morgan prepared a "development plan" that identified the following areas for improvement: visioning and strategic thinking, inspirational leadership, and managing change and building commitment. However, they did not implement the development plan because Morgan shifted her focus to address Wiener's immediate concerns about Carter's leadership of the IT department. Among the specific issues that triggered Wiener's concerns were

4

wires hanging from a conference room ceiling at the Georgetown location (a problem that fell under the IT department's responsibility and that had not been fixed for eight months) and that he felt that he had to monitor two of Carter's projects "very intensely" to make sure that IT users were satisfied.

To address Wiener's concerns, Carter and Morgan developed a new plan to address Carter's communication, execution, and organization skills: the C.E.O. plan. Carter devised the plan's title and presented the plan to Wiener. Carter testified that these were three areas in which he intended to improve and Wiener had told him that he needed improvement. In addition to general objectives, the plan listed specific issues that Carter needed to address (such as hiring staff for vacant positions and reviewing certain contracts) or had just recently addressed (such as ensuring that boardrooms were properly equipped for meetings and eliminating clutter). At his deposition, Carter did not dispute that Wiener had expressed concerns that he lacked a vision or strategy for the IT department.

**3.      Carter's accomplishments**

Carter emphasizes that he undertook several initiatives during his tenure at TAI, such as: 1) switching the company from using LotusNotes to Outlook; 2) creating a help-desk system to track IT help-desk tickets and user complaints; 3) changing the company's server provider, resulting in lower costs and better risk-management; and 4) implementing "failover" systems for power loss. Also, he annually accomplished the IT department's budget priorities. With respect to the company's help-desk statistics, Carter emphasizes that the declining number of help-desk tickets showed that he had been successful in improving IT functions. From 2007 to 2008, the company experienced an overall, slight downward trend in help-desk tickets, with a significant drop in tickets

in late 2008 compared to 2007. The company generally considered help-desk statistics as a positive indicator of IT performance.

**4.      Unfavorable employee feedback**

In September 2007, Carter received the results of TAI's 2007 Viewpoint Employee Opinion Survey that summarized responses from twenty-six IT employees. A similar survey had been conducted in 2003. The 2007 survey contained the following unfavorable responses for Carter's IT department:

> • Do you often get conflicting orders or instructions and as a result often do not know what you are supposed to do?
>> Carter's department decreased from 53 percent favorable in 2003 to 31 percent favorable in 2007.

> • How satisfied are you with the morale in your division?
>> Carter's department decreased from 26 percent favorable in 2003 to 23 percent favorable in 2007.

> • How satisfied are you with the job performance of your department head?
>> Carter's department decreased from 44 percent favorable in 2003 to 27 percent favorable in 2007.

At his deposition, Carter did not dispute the unfavorable nature of these responses. He testified that, in response to the survey results, he had changed the coffee and lighting in the department, and had built a picnic table, but he did not recall doing anything more specific.

**5.      Keiser becomes Carter's supervisor and unfavorably rates Carter's leadership skills**

In late 2007, TAI modified the IT department's reporting structure. Specifically, the IT department began reporting indirectly to Wiener through Keiser, who was assigned to the position of vice president/general manager of management systems, internal audit and consulting. As a result

of this change, Keiser became Carter's direct supervisor in December 2007. Upon being assigned

the new position, Keiser's office was right down the hall from Carter at TAI's Georgetown,

Kentucky location, whereas Wiener had been based in New York.

In February 2008, Keiser completed Carter's written performance review, rating him overall

as "M-minus," i.e., less than meeting expectations:

1) Carter had adequate knowledge of job requirements and understood the technical side of the IT business, but his managerial side needed strengthening because he often "appear[ed] to be in reactive mode versus a proactive and planned approach," "seem[ed] to over[-]exaggerate . . . situations," and conveyed a sense of "panic" to IT staff.

2) As to his analytical ability and judgment, Carter was "usually prepared" and most of his decisions were sound; he was "[v]ery organized in [his] thoughts to a software or hardware issue" but "[s]ometimes appear[ed] reluctant to react or take action once the issues [were] understood." For example, Keiser recommended that Carter should take a more inquisitive approach to certain issues, such as new board room equipment.

3) On planning and work organization, Carter was "sometimes late in meeting commitments." Keiser commented that, although Carter met objectives in his fiscal year-end 2008 budget priorities, improvement could be achieved in planning and organizing daily, weekly, and monthly objectives; and it appeared that Carter was "being driven rather than being the driver" of the IT department.

4) On initiative and acceptance of responsibility, Carter was usually not assertive, although no specific instance was provided.

5) Carter "usually turn[ed] out acceptable work" without many errors. The results of specific projects were "very favorable." On the other hand, Keiser commented that Carter should ensure that configuration of the network was capable of meeting TAI's requirements before a problem arises; suggested developing a plan to implement a new version of Microsoft Office, as some employees were having version problems; and noted that Carter was not active in trying to fill "multiple positions [that had been] open for months."

6) Carter reacted positively to assignments. However, Keiser commented that he was concerned that Carter relied on too much direction from upper management as opposed to having his own vision for the IT department.

7) Carter was a "very likable person," but:  a) did not seem to respond as an "internal consultant" to persons outside of the IT department—for example, with respect to one project, Carter appeared more concerned about why he should not take on the project rather than seeing "where the organization is going" and what he could do "to make this the most efficient and positive going forward"; and b) relied too much on email to contact persons when issues arose instead of approaching them personally or calling them by phone.

8) Regarding his attitude toward the company, Carter had "nothing but the best intent for the company" and was a good team player.

In summary, Keiser recommended that Carter develop time management, strategy, and planning skills; and prepare for being the chief IT executive for a company twice the size in five years.  He also suggested that Carter should be more interactive with IT users.  Under employee comments, Carter objected by emphasizing his accomplishments on certain projects but did not dispute Keiser's points.

Around this time, Keiser also attempted to counsel Carter on the original development plan that Morgan did not implement because Carter's coaching program had been overhauled to address Wiener's immediate concerns.  At his deposition, Carter acknowledged that Keiser had provided him with a number of suggestions on how to improve his image as a leader.  In May 2008, Keiser provided Carter with notes about his leadership performance.  Among other items, Keiser commented that Carter had been late in finalizing a contract, and the IT department lacked a clearly defined organizational structure and functional responsibilities for employees.

According to Keiser, Carter made some improvement by following his suggestions.  Carter also met the IT department's budget priorities in 2008, and Keiser was unaware of any IT employees who had left the department because they were dissatisfied with Carter's leadership.  However, in June 2008, Wiener received an email complaint from a Japanese IT user company.  The user

expressed frustration with the Georgetown IT department's handling of several issues, including the failure to provide a fax number for a new fax machine and an IT employee's representation that the issue was on hold; and the mishandling of the user's IP address, causing the user's website to disappear, which issue was not resolved for about one month. Wiener forwarded the email to Keiser, with instructions for him to review the user's complaint with Carter and correct the problems. Keiser, in turn, forwarded the email to Carter, stating that "[t]his unfortunately creates problems . . . when the [chief operating officer] has to get involved."

In September 2008, Keiser met with Carter to discuss further suggestions on Carter's leadership skills. Specific suggestions included leading morning meetings and walking around the office to personally talk to staff members. At his deposition, Carter did not dispute Keiser's suggestions and testified that he executed them. Nevertheless, Keiser and Wiener continued to receive IT user complaints expressing frustration about Carter's responsiveness, including an email from an affiliate company's representative stating that it had been nearly two weeks since the company requested an approximate transition schedule from the IT department but had received nothing in response, even though Carter had "a rough draft of such a document when [he] visited previously."

**6. Termination**

In the fall of 2008, Keiser recommended to Wiener that Carter be fired on the basis of his inability to perform at the level of general manager of IT. Wiener approved Carter's discharge—effective January 29, 2009. At the time of Carter's firing, he was fifty-seven years old. TAI replaced Carter with a forty-eight year old Caucasian male.

**B.**

Carter filed this action, asserting that TAI unlawfully terminated his employment on the basis of his race and age.[1]  The district court granted TAI's motion for summary judgment.  *See Carter v. Toyota Tsusho Am., Inc.*, No. 10-cv-132, 2012 WL 786344 (E.D. Ky. March 9, 2012).  The court assumed that Carter established a prima facie case as to both discrimination claims and concluded that TAI articulated legitimate, non-discriminatory reasons for firing him.  *Id.* at *4–5.  The court dismissed the action on the basis that Carter had failed to offer sufficient evidence to rebut TAI's reasons for firing him and thus did not establish a genuine issue for trial.  *Id.* at *6–7.  Carter timely appealed.

**II.**

**A.**

"We review de novo the district court's grant of summary judgment."  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  *Hawkins*, 517 F.3d at 332 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

---

[1]Carter also raised a failure-to-promote claim, but he has abandoned that claim on appeal.

**B.**

Carter claims that TAI fired him based on unlawful race and age discrimination, in violation of the ADEA, Title VII, and the KCRA. *See* 29 U.S.C. § 623(a)(1) (ADEA); 42 U.S.C. § 2000e–2(a)(1) (Title VII); Ky. Rev. Stat. Ann. § 344.040(1)(a) (KCRA). Because Carter does not present direct evidence of discrimination, his claims under these statutes are analyzed under the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495–96 (Ky. 2005) (applying *McDonnell Douglas* to KCRA age-discrimination claim); *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 797 (Ky. 2004) (applying *McDonnell Douglas* to KCRA race-discrimination claim).

Under the first step, Carter must establish a prima facie case of employment discrimination by showing that: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). "In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." *Grosjean*, 349 F.3d at 335; *see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996). Under the second step, once Carter has established a prima facie claim, "the defendant must 'articulate some legitimate, nondiscriminatory reason' for the termination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *McDonnell Douglas*

11

*Corp.*, 411 U.S. at 802). "If the defendant meets this burden, then [under the last step] the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." *Id.* (internal quotation marks omitted).

The parties do not dispute that Carter established a prima facie case of race and age discrimination, or that TAI articulated legitimate, nondiscriminatory reasons for terminating his employment. The only question before us is whether there is a triable issue as to whether TAI's articulated reasons were pretext.

### C.

Carter argues that the district court incorrectly applied a "pretext-plus" standard to his claims. The district court stated:

> Plaintiff attempts to demonstrate that the proffered reason was not the actual reason for his termination. For his claims to survive Defendant's motion for summary judgment, Plaintiff is required to provide some proof suggesting that, not only is Defendant's proffered reason not the real reason Plaintiff was fired, but that the actual reason was discrimination. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804–05 (6th Cir. 1994). "[E]stablishing that the employer's reason was a pretext requires that a plaintiff *do more than simply impugn the legitimacy of the asserted justification*; in addition, the plaintiff must also adduce evidence of the employer's discriminatory animus . . ." *Id.* (emphasis added) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 513–15 (1993)). In other words, "[a] reason cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *[Hicks]*, 509 U.S. at 515 (internal quotation marks omitted) (emphasis in original).

*Carter*, 2012 WL 786344, at *6 (first alteration in original) (italics corrected to reflect R. 59).

The district court's articulation of the law on this point is understandable given this circuit's prior case law, but was nonetheless incorrect. In *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012), we held that a district court erred by requiring that a plaintiff "offer some evidence that the

*real* reason for his termination was discrimination" in addition to the evidence supporting his prima

facie case and a showing of pretext. We explained:

> In *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court held that judgment as a matter of law for the defendant in an employment-discrimination case may be appropriate under certain circumstances even if the plaintiff has made out a prima facie case of discrimination and has shown pretext. 530 U.S. 133, 148 (2000). In other circumstances, however, a prima facie case and a showing of pretext can support a jury verdict for the plaintiff. *Id.* at 147–48. "[B]ecause a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, [a court] err[s] in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Id.* at 149. Applying the rationale of *Reeves* to the summary-judgment context, we have held that "to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), *as recognized in Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009).

> The district court thus erred in assuming that [the plaintiff] had to produce additional evidence of discrimination in order to survive summary judgment. Summary judgment for the defendant may be appropriate even after the plaintiff has presented evidence that the defendant's proffered reason for the termination was false "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. The district court did not consider any of these factors, but instead, contrary to *Reeves*, "proceed[ed] from the premise that a plaintiff must always introduce additional, independent evidence of discrimination" after showing pretext. *Id.* at 149.

*Id.* at 593–94 (internal citations altered; most alterations in original).

In the instant case, the district court quoted language from *Hicks*, where the Supreme Court

stated that "a reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that

the reason was false, *and* that discrimination was the real reason." 509 U.S. at 515 (internal

quotation marks omitted). However, as we observed in *Griffin*:

13

> The question in *Hicks* was whether a showing of pretext "mandates a finding for the plaintiff," 509 U.S. at 504, which is a different question from what a plaintiff has to show to survive summary judgment.
>
> The ultimate question of fact in a Title VII race-discrimination case is, of course, whether the defendant discriminated against the plaintiff on the basis of race. Racial animus is not the only inference that can be drawn from evidence that the proffered reason for an adverse employment action was pretext. Evidence that the employer's proffered reason for the termination was not the actual reason thus does not mandate a finding for the employee, *Hicks*, 509 U.S. at 511, but is enough to survive summary judgment, *see Blair*, 505 F.3d at 532. The jury can decide whether racial animus was the actual reason for [the plaintiff]'s termination.

689 F.3d at 594 (internal citations altered). Thus, to the extent prior case law suggests that to survive summary judgment a plaintiff must do more than sufficiently call into question the employer's proffered reasons for its employment decision, *see, e.g.*, *Pierce*, 40 F.3d at 804–05 (applying *Hicks* rule to summary judgment), it is no longer the law of this circuit in light of *Reeves*.

**D.**

Although the district court misstated the law, this error does not warrant reversal. The court correctly held that Carter failed to establish pretext. To show pretext at the summary judgment stage, "the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis and internal quotation marks omitted), *abrogated on other grounds by Gross*, 557 U.S. 167, *as recognized in Geiger*, 579 F.3d at 621. "The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's

discharge never happened, i.e., that they are factually false." *Manzer*, 29 F.3d at 1084 (emphasis and internal quotation marks omitted). Under the second type of showing,

> the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id.* (emphasis omitted). Carter does not assert that TAI's articulated reasons were insufficient under the third type of showing.

**1.      There is no triable issue whether TAI's proffered reasons have a factual basis**

Contrary to Carter's argument, TAI's proffered reasons for firing him have a factual basis. Carter's argument on this point primarily consists of his assertions that he had led the IT department through successful projects; had met and exceeded the expectations of his first supervisor, Wiener; and, before working at TAI, had a successful work history in the IT field. He does not, however, dispute the evidence TAI cites in support of its proffered reasons. The 2007 Viewpoint Employee Opinion Survey contained unfavorable responses regarding Carter's leadership of the IT department, including a mere twenty-seven percent satisfaction rate with Carter's performance as the department head. At his deposition, Carter did not dispute the unfavorable nature of the survey response. Further, although the 360 Report was a confidential document during Carter's employment (and thus its results cannot be cited as a reason for his termination), the report corroborates TAI's position that Carter had perceived leadership deficiencies before Keiser became his direct supervisor, and that Wiener viewed Carter's leadership abilities less favorably than Carter asserts.

Although the parties disagree about the reason Wiener asked Carter to participate in executive coaching, the district court properly concluded that such dispute was immaterial. Carter does not dispute that the coaching program was overhauled, early on, to address Wiener's immediate concerns. At his deposition, Carter conceded that Wiener had felt that he needed improvement in several leadership skills. Carter also conceded that Wiener had expressed concerns that he lacked a vision or strategy for the IT department. Moreover, Carter has not proffered evidence to refute specific instances of his alleged deficient performance.

Given TAI's evidence supporting its reasons for firing Carter and Carter's failure to identify any material dispute as to the falsity of such evidence, his focus on his accomplishments is more properly brought under the second type of pretext showing.

**2.      There is no triable issue whether TAI's proffered reasons did not actually motivate its decision**

Employers are entitled to "greater flexibility" in management-level employment decisions, *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987), and we do not "act[] as a super personnel department, overseeing and second guessing employers' business decisions." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006) (internal quotation marks omitted). However, "[w]e recognize . . . that decisions made on the basis of subjective criteria, such as whether an employee is an effective manager, can provide a ready mechanism for discrimination, and thus such decisions are carefully scrutinized." *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 504–05 (6th Cir. 2011) (unpublished) (internal quotation marks omitted); *see Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 461 (6th Cir. 2004). "An employer's business judgment . . . is not an absolute defense to

unlawful discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc). "[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* To show pretext on this basis, Carter must show that TAI's "business decision was so lacking in merit as to call into question its genuineness." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (internal quotation marks omitted).

Carter points to evidence suggesting that he met and possibly even exceeded company expectations in some respects. For example, both Keiser and Wiener spoke of Carter's positive qualities, and Keiser conceded that TAI suffered no objective harm from having Carter as the IT department head. Although there is a factual dispute over whether Wiener gave Carter favorable written reviews,[2] Carter asserts that: 1) his salary increases from 2003 to 2007 reflect that Wiener

---

[2]As to the purported reviews, the district court stated:

> Plaintiff urges the [c]ourt to make an adverse inference from what [he] alleges is Defendant's spoliation of Carter's previous favorable performance reviews, rendered by Mr. Wiener. The [c]ourt notes that, even if favorable written reviews are presumed to exist . . . the [c]ourt's resolution of this issue does not change.

*Carter*, 2012 WL 786344, at *7 n.1. In a footnote in the background section of his opening brief, Carter reasserts that TAI "withheld or discarded" favorable reviews he received from 2002 to 2007. He relies on his own assertion that he received written reviews and the fact that Keiser has received written reviews. He then cites spoliation cases that concern missing evidence instructions and adverse inferences drawn against a party that engages in spoliation. Generally, an argument raised in a footnote without further development is deemed waived. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006). In any event, even assuming that Carter preserved this argument and that written reviews once existed, the fact that Wiener may have favorably rated Carter's work earlier does not obviate the fact that Wiener was also critical of Carter's management skills and does not establish that Carter continued to meet the company's legitimate expectations.

favorably viewed his performance, as salary increases were generally tied to performance;[3] 2) the company invested $10,000 in providing him with executive coaching—arguably a sign that the company saw him as having long-term potential; and 3) he implemented successful IT changes during his tenure, such as the help-desk tracking system.

Nevertheless, that Carter had been a successful employee and may have even exceeded company expectations in certain respects does not establish that TAI's proffered reasons for firing him were unreasonable, let alone pretext for illegal discrimination. Even if Wiener rated him favorably in the past, this does not establish that Carter continued to meet company expectations. *See Wright v. Sears, Roebuck & Co.*, 81 F. App'x 37, 42–43 (6th Cir. 2003) (unpublished) (explaining that positive reviews from prior managers did not demonstrate that the plaintiffs had met the legitimate expectations of new management); *cf. Strickland v. Fed. Exp. Corp.*, 45 F. App'x 421, 424 (6th Cir. 2002) (unpublished) (noting, in the context of determining whether a plaintiff is qualified, that prior favorable reviews may suffer from "staleness," as the employee's performance may change or the employer's expectations may change). Further, Carter does not dispute that Wiener also criticized his leadership ability and that the coaching program was overhauled due to Wiener's immediate concerns about his management skills. To the extent Carter characterizes Keiser's criticisms as subjective, he does not dispute the specific instances of his perceived deficiencies or the objective evidence such as the 2007 Viewpoint Employee Opinion Survey.

---

[3]For three of five years while under Wiener's supervision, Carter's salary increases were at or below the 3.5 percent target increase for employees meeting expectations, which is more consistent with Wiener's testimony that he gave Carter "midline" performance ratings.

Moreover, the evidence does not otherwise suggest a discriminatory motive. At his deposition, Carter conceded that neither Wiener nor Keiser made offensive race- or age-based comments to him. Also, Morgan testified that his supervisors wanted him to succeed. Insofar as Carter opines that Keiser's overlooking of his accomplishments was based on a discriminatory motive, conclusory allegations are insufficient to sustain a claim. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). And the district court correctly observed a more plausible reason for Keiser's criticism of Carter's management skills:

> Aside from the fact that TAI had grown and its IT needs had expanded, the [c]ourt notes what it finds to be a logical explanation for Plaintiff's feeling that Keiser, as opposed to Mr. Wiener, was especially critical of Plaintiff's work performance. Prior to Keiser's becoming Vice President/General Manager of Management Systems, Internal Audit and Consulting, Plaintiff's direct supervisor was located in New York while Plaintiff was working in Georgetown, Kentucky. Although Plaintiff saw Wiener occasionally, the interaction between the two men was limited and was mainly through email and telephone calls. Wiener's absence from the company's Georgetown location made it impossible for him to monitor Plaintiff's day-to-day performance to the same degree as Keiser, once he became Plaintiff's supervisor.

*Carter*, 2012 WL 786344, at* 7.

Also, Carter overlooks the fact that his termination was not solely in Keiser's hands. Although Keiser recommended Carter's termination to Wiener, it was ultimately Wiener—the TAI officer who recommended Carter's initial hire—who approved Carter's termination. We do not conclude that a supervisor's discriminatory motive is obviated when upper management approves an employee's termination; however, given the prior relationship between Wiener and Carter, and that Carter's case for pretext centers on his alleged good performance under Wiener, Wiener's

approval of Carter's termination undercuts the argument that there was a discriminatory motive for

TAI's termination decision.

In conclusion, Carter has failed to create a triable issue on pretext, and he cannot proceed to

trial based on a subjective disagreement with TAI's business judgment. *See Hedrick*, 355 F.3d at

462.

**III.**

For the foregoing reasons, we AFFIRM the district court's judgment.