NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0188n.06

Case No. 23-6075

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 07, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| CHARLES CARROLL, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| IDEMIA IDENTITY AND SECURITY USA, | ) | TENNESSEE |
| LLC, | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before: GRIFFIN, STRANCH, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** After IDEMIA Identity and Security USA terminated Charles Carroll's employment, he sued IDEMIA for disability discrimination, age discrimination, False Claims Act retaliation, and breach of contract. Carroll appeals the district court's grant of summary judgment in IDEMIA's favor. Discerning no error, we affirm.

## I.

IDEMIA specializes in biometric identification and security. For example, it provides state and federal governments with identity technology platforms, such as fingerprinting and facial-recognition services. In 2011, IDEMIA named Carroll its Senior Vice President ("SVP") of Enrollment Services. In that role, Carroll oversaw a contract with the Transportation Security Administration ("TSA") to administer its PreCheck program. Carroll also sat on IDEMIA's Executive Committee and reported directly to IDEMIA's Chief Executive Officer.

In 2017, Carroll conceived of a new service innovation called "Trusted Fan." This program would use biometric identity services to streamline access to large venues such as stadiums and arenas. In essence, Trusted Fan participants would enter venues and make purchases simply by waving their hand. Both Carroll and IDEMIA believed Trusted Fan would create a significant revenue stream for the company. Along with overseeing the Enrollment Services unit, Carroll also oversaw Trusted Fan's development.

In January 2018, Ed Casey became IDEMIA's new CEO. Casey announced his intent to replace every member of the Executive Committee. That said, Carroll remained SVP of Enrollment Services and an Executive Committee member. Shortly after Casey joined IDEMIA, Carroll told him that he had prostate cancer. Casey was empathetic and encouraged Carroll to take care of his health.

Later in 2018, TSA told IDEMIA that it intended to solicit proposals for the PreCheck program. This meant IDEMIA had to compete with other companies to keep its contract with TSA. In January 2019, Carroll's business unit ultimately secured the contract ("TSA contract"), which Carroll claimed was worth $3 billion—the largest contract ever awarded to IDEMIA. Carroll's unit also made the second highest net sales for 2018. Based on these successes, IDEMIA recognized Carroll's unit as business unit of the year.

Yet Casey criticized Carroll's work on the TSA contract. In his view, Carroll did not have a strategy for the contract-renewal process, even though the contract was a critical source of revenue for IDEMIA. Moreover, according to Casey, Carroll's bid proposal had several significant mistakes. As a result, Casey started losing confidence in Carroll's leadership abilities. He wanted to remove Carroll as SVP of Enrollment Services, but advisers counseled him to wait until after the contract-renewal process ended.

From the start, Casey also had concerns about Trusted Fan. He believed that Trusted Fan and PreCheck needed separate leaders because both were large programs central to IDEMIA's success. So in October 2018, Casey told his boss, Yann Delabriere, that he planned to move Enrollment Services from Carroll to a different business unit.

Despite his concerns about Carroll's performance, Casey gave him a 100% performance rating for 2018. Carroll's evaluation noted that he "[w]on" the TSA contract and developed a "successful marketing campaign to support growth" in PreCheck enrollment. R. 80-3, PageID 1570. As for his work on Trusted Fan, Casey indicated that Carroll made "[g]ood [p]rogress on Trusted Fan business model development, growth strategy and secured several pilots," but that he "[c]ould possibly have achieved more with [a] stronger team and putting more resources in place earlier in the year." *Id.* To sum it up, Casey wrote: "Just think we could have accomplished more during the year (especially in [Trusted Fan]) and have been limited by the team (short resources, critical capabilities and talent)." *Id.*

After IDEMIA secured the TSA contract, Casey told Carroll he planned to separate Trusted Fan from Enrollment Services. Casey offered Carroll a new role overseeing IDEMIA's commercial contracts and market opportunities (SVP of Corporate Development). At first, Carroll was interested in the role and requested a pay raise and increased bonuses. Although IDEMIA already paid Carroll more than any other Executive Committee member, Casey supported his request for a higher salary.

But Carroll changed his mind and told Casey he wanted to keep running both Enrollment Services and Trusted Fan. Casey responded that Carroll had to choose between the two. After some time, Carroll decided to keep Trusted Fan, which fell under the role of SVP of Citizen

Services. At one point, Carroll told Casey he wanted to resign instead, but Casey emphasized that he wanted Carroll to stay with IDEMIA.

The parties then began a long—and somewhat tense—negotiation process, primarily centered on Carroll's requests for more money. Near the end of the negotiations, Casey explained that he "want[ed] [Carroll] to stay" and "want[ed] [Carroll] as a partner," but Carroll had "taken advantage of [Casey's] kindness" and taken IDEMIA to its "limits" during the negotiations. R. 60-2, PageID 756. In July 2019, Carroll accepted the role of SVP of Citizen Services. With this new role, Carroll became the highest paid member of the Executive Committee. Despite this pay increase, Carroll believed that IDEMIA had demoted him because the new role was "a lesser job with lesser responsibility." R. 78-1, PageID 1220.

Though Casey was still skeptical of Trusted Fan's business model, he gave it additional support at this time—including a budget for new hires and marketing. He also helped Carroll create an incentive plan for Digital Labs, the group developing the Trusted Fan technology.

But less than four months later, IDEMIA terminated Carroll, supposedly because of his "failure of leadership of Trusted Fan and his performance." R. 77, PageID 1161. Carroll acknowledged that "everyone was concerned about [Trusted Fan]." *Id.* at 1140. But he argued that Trusted Fan's failure was not his fault. He claimed that IDEMIA did not give Trusted Fan the support or funding it needed to succeed, noting that Trusted Fan did not have dedicated staff until his appointment as SVP of Citizen Services. IDEMIA also insisted he use Digital Labs to create the Trusted Fan technology, even though Digital Labs had failed repeatedly to prioritize the project. The technology was crucial to Trusted Fan's success, and IDEMIA agreed that Digital Labs "mov[ed] slow[ly] with production of Trusted Fan technology." R. 90, PageID 1846. On

top of that, IDEMIA ballooned its revenue assumptions for Trusted Fan to inflate its image for a potential public offer.

IDEMIA, however, viewed Trusted Fan's problems differently. It asserted that Carroll failed to create a viable business model for the project. Indeed, Carroll's model hinged on expensive marketing agreements with sports teams and venues that Casey feared would result in very little return. Nonetheless, IDEMIA spent large sums on these marketing agreements. Eventually, due to his growing concerns about the project, Casey had another IDEMIA executive, Ben Mallen, review Trusted Fan's business model. Mallen confirmed Casey's suspicions that the revenue predictions were flawed because they relied on unrealistic and unsupported estimates of adoption rates by attendees at events. Mallen concluded that Carroll's business model was unworkable; his "digital strategy" was not "mature"; he had no cohesive project plan; and he had no target date for when the program would be operational. R. 56-1, PageID 263.

In September 2019, Casey and Mallen met with Carroll to discuss Trusted Fan. According to Casey and Mallen, Carroll had very little grasp on the business and could not answer basic questions about the project or its revenue potential. When Casey told IDEMIA's leadership his concerns about Carroll and Trusted Fan, they determined that there was "a real problem" and that they "had lost confidence in [Carroll's] ability to lead and to execute." R. 56-4, PageID 433.

So on November 6, 2019, Casey told Carroll that he would be terminated. Carroll says that Casey never gave a reason for the termination but simply stated that IDEMIA was "going to go in a different direction." R. 56-2, PageID 342. Carroll's termination, for "underperformance and misconduct,"[1] became effective two weeks later. R. 77, PageID 1165. Because both

---

[1] After notifying Carroll of his termination, IDEMIA learned that Carroll allegedly engaged in misconduct.

underperformance and misconduct constituted "cause" under his employment contract, Carroll would not receive full severance pay.

Carroll believed his disability and age motivated IDEMIA's decision to terminate him. Starting with his disability, Carroll asserted that Casey asked about his health "constantly" and was "seemingly obsessed with how it was affecting [his] ability to work." *Id.* at 1121. Though Casey expressed concern and understanding in response to Carroll's updates on his health, Carroll viewed Casey's responses as disingenuous. Additionally, Carroll claimed that Casey repeatedly told him there should be "[n]o surprises" concerning his health. R. 78-1, PageID 1202. And IDEMIA admitted that Casey did not want Carroll's cancer or treatments to reflect on any of Casey's work output.

Carroll also pointed to a specific text message that Casey sent him in March 2019 about Carroll's cancer treatments in Germany. Carroll suggested that the text—specifically the reference to Germany—showed that Casey removed some of his duties because of his cancer treatments.

Lastly, Carroll emphasized Casey's conduct in June 2019, when Carroll received the cancer treatment in Germany. Before Carroll knew the dates of his trip, Casey asked that he give an "advance warning" so that Casey could plan for his absence. R. 60-2, PageID 738. While Carroll was in Germany, Casey asked if he felt well enough to attend certain meetings and often asked how Carroll was feeling. When Casey asked about the treatment, Carroll responded that it was "very tough" and "much more difficult than expected."

According to Carroll, Casey's "probing into [his] work abilities became more prevalent" after the trip. R. 77, PageID 1178. For example, Casey emailed him: "Hope you are feeling a little better," and "I know you are not feeling 100% so be smart about conserving your energy and building your strength." R. 80-9, PageID 1607, 09. And Carroll further emphasized that just days

before his termination, Casey learned he had a medical appointment at MD Anderson—a cancer treatment center for patients with "serious cancer." R. 78-4, PageID 1318.

Carroll also believed that his age played a role in his termination. He noted that, sometime in 2018, Casey asked him why he still wanted "to do the heavy lifting" and work "so hard" "at [his] age." R. 90, PageID 1854. Carroll asserted that this comment "directly questioned [his] ability to do his job based on his age." *Id.* Also, when Casey and Delabriere discussed moving Carroll to a new position, Delabriere stated that it was "critical that [Carroll] remains on board for passing on . . . the key contacts with the clients" to younger executives. R. 80-18, PageID 1741. And when Casey offered Carroll the SVP of Corporate Development role, he told Carroll that the role was important and that it was "not putting [him] out to pasture." R. 60, PageID 654. Plus, IDEMIA executives had ongoing discussions about the company's aging workforce and communicated a "desire to hire younger talent." R. 90, PageID 1854.

Carroll sued IDEMIA for disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; retaliation, in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*; and breach of contract under Tennessee law. The district court granted summary judgment to IDEMIA on all claims.

On appeal, Carroll challenges the grant of summary judgment on his ADA, ADEA, and breach-of-contract claims. Carroll does not challenge the district court's judgment on his FCA retaliation claim.

**II.**

We review a district court's summary-judgment decision de novo. *Puskas v. Delaware County*, 56 F.4th 1088, 1093 (6th Cir. 2023). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022).

**A.**

*ADA Claim*. The ADA prohibits employers from discriminating against employees "on the basis of disability." 42 U.S.C. § 12112(a). A plaintiff relying on circumstantial evidence of disability discrimination must establish a prima facie case using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 452–53 (6th Cir. 2004). To do so, the plaintiff must show that: (1) he has a disability; (2) he "was otherwise qualified for the position, with or without reasonable accommodation"; (3) his employer took an adverse employment action against him; (4) his employer "knew or had reason to know" about his disability; and (5) his employer replaced him. *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) (citation omitted). Upon establishing a prima facie case, the burden shifts to the employer to identify a legitimate, nondiscriminatory reason for its actions. *Hedrick*, 355 F.3d at 453. If the defendant provides such a reason, then the burden shifts back to the plaintiff to show pretext. *Id.*

We assume without deciding that Carroll established a prima facie case of disability discrimination. The burden thus shifted to IDEMIA to proffer a legitimate, nondiscriminatory

reason for Carroll's termination. *See id.* IDEMIA did so by presenting evidence that it terminated Carroll because of his poor performance on Trusted Fan.[2]

The burden then shifted back to Carroll to show that this reason was pretext for discrimination. *See id.* A plaintiff can prove pretext by showing that the defendant's proffered reason: "(1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (quotation omitted). These are common ways to show pretext, but they "are not the only ways." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Instead, these "categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Id.* (internal quotation marks omitted). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (brackets and quotation omitted).

IDEMIA argues that the honest-belief rule defeats Carroll's pretext evidence. Under the honest-belief rule, a defendant may rebut certain evidence of pretext by providing "conclusive evidence that the defendant honestly believed its proffered reason, and that the belief was reasonably based on particularized facts that were before it at the time the decision was made." *Briggs*, 11 F.4th at 515 (internal quotation marks omitted). So if an "employer ha[d] an honest

---

[2] Shortly after it decided to terminate him, IDEMIA learned that Carroll allegedly engaged in misconduct. As a result, it added misconduct as a basis for his termination. But IDEMIA admits it investigated Carroll for misconduct *after* it decided to terminate him. Because Carroll's misconduct is a post-hoc justification for his termination, and the record lacks evidence related to the alleged misconduct, we do not consider it a basis for Carroll's termination.

belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted).

But employers cannot always rely on the honest-belief rule—it applies only when a plaintiff argues that the employer's reason for taking an adverse action "has no basis in fact." *Briggs*, 11 F.4th at 515. The rule does not apply when a plaintiff tries to show pretext in a different way. *Id.* Carroll does not argue that IDEMIA's decision had no basis in fact. Instead, he argues that IDEMIA's decision to terminate him was "unreasonable" and that his performance did not actually motivate his termination.

These theories of pretext are different. Arguing that a proffered reason had no basis in fact is "essentially an attack on the credibility of the employer's proffered reason." *Seeger*, 681 F.3d at 285 (quotation omitted). On the other hand, a plaintiff who argues that a proffered reason was unreasonable "does not so much challenge the *facts* underlying [the employer's] stated reasons for firing [him] as []he does the likelihood that a *reasonable* [employer] would have *actually relied on those facts* to fire [him]." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 323 (6th Cir. 2019). Instead of challenging the facts underlying the decision, plaintiffs who attack the reasonableness of an adverse action rely on a different pretext theory: the defendant's motivation. *Id.* at 320.

Carroll's argument reflects the latter. He does not deny Trusted Fan failed; instead, he argues that it was unreasonable for IDEMIA to fire him because of it. Therefore, the honest-belief rule does not apply.

Even so, Carroll has not created a genuine dispute of fact about pretext. His central argument is that IDEMIA's decision to terminate him for his performance was unreasonable. "To show pretext on this basis, [the plaintiff] must show that [the employer's] business decision was so lacking in merit as to call into question its genuineness." *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (quoting *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996)). To do so, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Parkhurst v. Am. Healthways Servs., LLC*, 700 F. App'x 445, 449 (6th Cir. 2017) (quotation omitted).

IDEMIA asserts that its dissatisfaction with Carroll's performance stemmed from his leadership of Trusted Fan. Carroll agrees that Trusted Fan was his responsibility and that "it was not making progress, nor meeting [IDEMIA's] inflated revenue projections." D. 19 at p.47. He also acknowledges that eventually "everyone was concerned" about the project. R. 77, PageID 1140. Yet Carroll argues that IDEMIA's decision was unreasonable because the problems with Trusted Fan were not his fault. He points to IDEMIA's unrealistic revenue predictions and Digital Labs' failure to prioritize the Trusted Fan technology. True enough, Casey knew that the immature technology was Digital Labs' fault. And IDEMIA admitted that it inflated the revenue projections. But these were not the only reasons Casey faulted Carroll's performance.

Shortly before firing Carroll, Casey had Mallen review Carroll's business model for Trusted Fan. Mallen found that elements of the project—one of IDEMIA's key businesses—were "not viable" and "unrealistic." R. 56-1, PageID 262. He concluded that the business model was unworkable; Carroll's revenue predictions were flawed; and the digital strategy was immature. Mallen also determined that Carroll had no project plan or target date for making the program operational. According to Casey and Mallen, when they met with Carroll to discuss these issues,

Carroll could not answer basic questions about the project. Casey determined that Carroll's business model—which relied on expensive marketing agreements—was flawed and lacked "foundational support." R. 56-4, PageID 433. IDEMIA thus concluded that Carroll had mismanaged the project. That conclusion was not unreasonable.

Consider *Wexler v. White's Fine Furniture, Inc.* 317 F.3d 564 (6th Cir. 2003) (en banc). There, the employer demoted the plaintiff, a store manager, for declining sales at the store. *Id.* at 577. Because the employer knew that the declining sales "[were] not [the plaintiff's] fault," we determined that a genuine issue of material fact existed about whether the demotion was reasonable. *Id.*

Here, though, the evidence shows that IDEMIA's dissatisfaction with Carroll stemmed from his business model. Indeed, Casey had concerns about Carroll's model from the start. Even so, Casey supported Carroll and worked with him to implement the model. Over time, Casey began to doubt the viability of the business model and Carroll's overall leadership of Trusted Fan. Then Mallen reviewed the business model and confirmed Casey's fears. Thus, IDEMIA determined that Trusted Fan was failing because of the business model and Carroll's leadership— not just because of the technology or the inflated revenue projections. And IDEMIA's dissatisfaction with Carroll's performance was not "so lacking in merit as to call into question its genuineness." *See Carter*, 529 F. App'x at 611 (quotation omitted).

Carroll directs our attention to *Babb*. But that case is distinguishable. In *Babb*, the employer fired the plaintiff, a nurse, for making two "clinical errors." 942 F.3d at 322. To show that the defendant's decision was unreasonable, the plaintiff provided expert testimony that she "acted reasonably during both incidents, and in accordance with" professional standards. *Id.* Plus, another employee sent an email announcing that the employer terminated the plaintiff because of

her disability. *Id.* at 313–14. We thus found a genuine dispute about whether the defendant acted pretextually. *Id.* at 324. But here, Carroll provides no such evidence to rebut IDEMIA's dissatisfaction with his performance.

Carroll also argues that IDEMIA failed to mention his performance when it first notified him of his termination. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Briggs*, 11 F.4th at 513 (quotation omitted). But IDEMIA's rationale for firing Carroll never changed—it always maintained that it terminated him for his performance on Trusted Fan. *See Miles*, 946 F.3d at 891 (concluding that employer's proffered rationales "do not conflict with the reason stated at the time of discharge" when the defendant "provided *no reason* at the time of discharge"). And importantly, employers "are entitled to greater flexibility in management-level employment decisions." *Carter*, 529 F. App'x at 611 (internal quotation marks omitted).

Carroll also emphasizes that he received a high performance rating for 2018 and that no one formally criticized his performance. Yet his 2018 performance review focused mostly on his success on the TSA contract—not Trusted Fan. His performance review also noted that he made "[g]ood [p]rogress on [the] Trusted Fan business model development, growth strategy and secured several pilots." R. 80-3, PageID 1570. But as discussed, Casey later came to learn that this business model was untenable and thus concluded that Carroll had mismanaged the project. *See Carter*, 529 F. App'x at 612 ("Even if [a supervisor] rated [the plaintiff] favorably in the past, this does not establish that [the plaintiff] continued to meet company expectations."); *Wright v. Sears, Roebuck & Co.*, 81 F. App'x 37, 43 (6th Cir. 2003) ("[M]eeting or even exceeding certain minimum requirements or baseline standards set by the company will not guarantee that an employee, especially a manager, is achieving the overall goals of the company."). All in all, no

genuine fact dispute exists about whether IDEMIA's decision to fire Carroll for his performance on Trusted Fan was reasonable.

Casey's comments about Carroll's health also do not create a question of fact about pretext. Carroll relies heavily on the following March 2019 message from Casey:

> Given [Trusted Fan, the TSA contract, and other work] plus the rest of the business—not to mention your upcoming trip to Germany and everything related to that. I am going to ask [another executive] to take the lead on what we discussed today. Just too much on your plate.

R. 60-2, PageID 778. He argues that this text message shows IDEMIA removed some of his responsibilities because of his cancer treatments. But months before sending this message, Casey told Delabriere that he wanted to split up the Executive Services and Trusted Fan roles. Carroll also admitted that Casey believed Trusted Fan "needed dedicated leadership to focus on developing and operationalizing a viable business model" and that "PreCheck was too important to the Company to have a leader that had his attention divided between PreCheck and . . . Trusted Fan." R. 77, PageID 1126–27. These admissions cut against any correlation between Casey's actions and Carroll's cancer treatment.

Carroll contends that Casey asked about his health "constantly" and was "seemingly obsessed with how it was affecting Carroll's ability to work." Casey also told Carroll that he did not want any "surprises" related to Carroll's health or for Carroll's cancer to reflect on any of his own work output. That said, Carroll acknowledged that he often initiated conversations with Casey about his health during this time. Many of Casey's messages expressed concern and were also work related, such as confirming whether Carroll could attend meetings or if he needed someone to cover for him.

Finally, Carroll points to temporal proximity, which "can be a strong indicator of pretext when accompanied by" other supporting evidence. *Briggs*, 11 F.4th at 516 (internal quotation marks omitted). Carroll emphasizes that Casey fired him "[m]ere days" after learning he had a medical appointment at MD Anderson Cancer Center. D. 19 at p.46. But temporal proximity cuts strongly the other way. By this point, Casey had known about Carroll's cancer for over a year. Yet Casey kept Carroll on the Executive Committee—even after announcing his intent to remove all Executive Committee members. Likewise, Casey knew Carroll was seeking cancer treatment long before his message about MD Anderson. In fact, Carroll told Casey in November 2018 that he had "been back to Mayo Clinic twice recently and have started a round of medication which is []very hard on my body." R. 60-2, PageID 699. Plus, around the time Carroll received cancer treatment in Germany, Casey repeated his desire to keep Carroll at IDEMIA and advocated for him to receive higher pay.

In the end, Carroll's ADA claim fails as a matter of law.

**B.**

*ADEA Claim.* The ADEA prohibits employers from discriminating against employees "because of" their age. 29 U.S.C. § 623(a)(1). To establish a prima facie case of age discrimination, a plaintiff must show: (1) he was over the age of 40; (2) his employer took an adverse employment action against him; (3) he was qualified for his position; and (4) his employer replaced him with someone outside of his protected class or treated him differently than a similarly situated non-protected employee. *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024). The plaintiff must also show that his age was the but-for cause of the adverse employment action. *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014). This requires proof that "age was the reason that the employer decided to act." *Id.* (quotations omitted). Though the *McDonnell*

*Douglas* burden-shifting framework still applies, the burden of persuasion always remains with the plaintiff to prove that his age was the but-for cause of his termination. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011).

Once again, we assume that Carroll established a prima facie case of age discrimination. Much like his ADA claim, Carroll's age-discrimination claim boils down to pretext.

A reasonable jury would not conclude that Carroll has shown pretext for his ADEA claim. To support pretext on his age-discrimination claim, Carroll relies on these comments: (1) Casey asked him why he "want[ed] to do the heavy lifting" and work so hard "at [his] age," R. 90, PageID 1854; (2) Casey told him that the SVP of Corporate Development role was not "putting [him] out to pasture," R. 60, PageID 654; and (3) Delabriere stated that they had "management issues . . . as regards his capacities for running" Trusted Fan, R. 80-38, PageID 1801. Carroll also asserts that Delabriere wanted him to stay at IDEMIA long enough to train a younger employee and that IDEMIA executives discussed their aging workforce. These stray and isolated comments do not show pretext. *See Diebel v. L & H Res., LLC*, 492 F. App'x 523, 533 (6th Cir. 2012) (comments did not show pretext where they were isolated and unconnected from the adverse action).

In *Blizzard v. Marion Technical College*, we rejected the plaintiff's argument that age-related comments established pretext. 698 F.3d 275, 287 (6th Cir. 2012). There, the plaintiff's supervisor commented that "[m]ost of the people here are the old people like you." *Id.* The supervisor made two other allegedly age-related comments about other employees being at the job "too long." *Id.* We decided that the two statements were "ambiguous because they could just as easily refer to tenure." *Id.* Also, because the allegedly "discriminatory remarks were unrelated to the decision to dismiss [the plaintiff] from her employment, they [did] not constitute evidence of discrimination." *Id.*

That same rationale applies here. Though Delabriere's comment concerned Carroll's termination, it is ambiguous and does not clearly relate to his age. And Casey's comments have no connection to Carroll's termination. In fact, he made these comments before giving Carroll a new role with a significant pay raise. What is more, Carroll must also prove that his age was the but-for cause of his termination—"not simply a motivating factor." *McNeal*, 117 F.4th at 896. Carroll's slim evidence of age discrimination cannot establish that his age was "the reason" IDEMIA terminated him. *See Scheick*, 766 F.3d at 529 (internal quotation marks omitted). Carroll thus failed to raise a genuine dispute of material fact on his age-discrimination claim.

## C.

*Breach-of-Contract Claim.* To establish breach of contract under Tennessee law, Carroll must prove: (1) "the existence of a valid and enforceable contract," (2) "a deficiency in the performance amounting to a breach," and (3) "damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citation omitted). Carroll argues that IDEMIA breached its employment contract and failed to act in good faith by not giving him full severance pay. His employment agreement stated: "If your employment is terminated by the Company for reasons other than performance or gross misconduct you will be eligible for a severance payment." R. 78-8, PageID 1401. IDEMIA terminated Carroll because of his performance on Trusted Fan. Because no reasonable juror could find IDEMIA terminated him for any other reason, Carroll's breach-of-contract claim fails.

## III.

For these reasons, we **AFFIRM** the district court's judgment.