John TREADWAY, Plaintiff–Appellant,

v.

**CALIFORNIA PRODUCTS CORPORATION, Defendant–Appellee.**

No. 15–5718

United States Court of Appeals, Sixth Circuit.

Filed August 1, 2016

Charlton Ross DeVault, Jr., Law Office, Kingsport, TN, for Plaintiff–Appellant.

Arthur Gershon Telegen, Lauren S. Wachsman, Erik W. Weibust, Seyfarth Shaw, Boston, MA, Matthew Dale Davison, Baker Donelson, Johnson City, TN, for Defendant–Appellee.

BEFORE: BOGGS and ROGERS, Circuit Judges; and BERG, District Judge.*

BERG, District Judge.

John Treadway sued his employer, California Products Corporation ("CPC"),

---

* The Honorable Terrence Berg, United States District Judge for the Eastern District of Michigan, sitting by designation.

claiming that he was terminated from his job in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* The district court granted summary judgment to CPC on Treadway's claim, holding that he did not establish a *prima facie* case of age discrimination and, even assuming that he had, that Treadway failed to show that CPC's purported reason for firing him was pretextual. We affirm the judgment of the district court for the following reasons.

## I.

Treadway began working for CPC in August 2009 when it acquired Treadway's previous employer, Progress Paint Manufacturing Company ("Progress"). Treadway had been covering a sales territory for Progress that included accounts in northeast Tennessee, southeastern Kentucky, Virginia, North and South Carolina, and the Bahamas. Treadway continued working as a salesman for CPC until his termination in December 2011 at the age of 69.

In 2009, Treadway, then age 66, notified his supervisor Noel Booker that he had decided to "slow down" and sought to reduce his sales territory because it required "a lot of travel". Treadway called Booker on March 9, 2009 to discuss a plan. That day, Treadway and Booker discussed reducing Treadway's accounts to those in the Bahamas and those within a 40-mile radius of where Treadway lived in Johnson City, Tennessee. Booker understood from this discussion that Treadway wanted to retire by the end of 2009, but Treadway denies ever telling anyone that he wanted to retire.

On or about March 17, 2009, Booker prepared a document outlining the terms that he and Treadway had discussed over the phone. For reasons he cannot recall, Booker prepared two separate versions of this document, both dated March 17, 2009.

Entitled "Compensation Plan April 2009—forward", the two versions are identical with the exception of one word used in a subheading identifying the section that outlines the 2010 terms of Treadway's compensation. In Version 1, this subheading reads "2010 (assumes you want to semi-retire)". In Version 2, it reads "2010 (assumes you retire)". No records exist indicating which version was created first or the reason for the one-word difference in language.

Both versions of the agreement state that the "premise of this plan" is to eliminate the territories of salesmen David Harrison and Bill Huff and divide their accounts between Treadway and fellow salesman David Lloyd. Both versions contemplate that Treadway would temporarily assume responsibility for Harrison's accounts in the Carolinas and Virginia until a new salesperson could be hired in 2010 to relieve Treadway of the "Harrison territory". Treadway would then "go from Company employee to independent sales agent" responsible only for the three accounts in the Bahamas and his "current accounts within approximately 40 miles of Johnson City". All other Treadway accounts would then be re-assigned to David Lloyd or the new salesperson, and Treadway's compensation would become commission-based. Both versions provided that Treadway would leave his position as an employee and become an independent agent, that the arrangement could be renewed annually "per mutual agreement by both parties," and that "[n]otification of intent [to renew] must be made no later than 60 days prior to December 1."

As provided in the agreement, Progress consolidated the Huff and Harrison territories on March 20, 2009. By April 1, 2009, Treadway had assumed responsibility for all of Harrison's accounts in North and South Carolina and Virginia as well as

Huff's two Bahamas accounts. Treadway had also ceded some of his accounts in North Carolina, Tennessee, and Kentucky to Lloyd, and two Kentucky accounts to fellow salesman Bruce Shoemaker.

On or about August 7, 2009, Progress formally announced that it has been acquired by CPC. When Progress was acquired, its sales force consisted of 12 people. CPC voluntarily retained all of the Progress sales employees, including Treadway. Of these sales employees, six were over 60 years old, five were over 50 years old, and one, the youngest, was 49. Treadway was the oldest sales employee by approximately ten months.

On August 9, 2009, Treadway sent Booker a handwritten note asking whether the March 9, 2009 agreement worked out with Progress would "still be ok for the start of next year" and would "hold for our new company?" Treadway also called Booker "on numerous occasions" after the acquisition to discuss whether the March 2009 agreement was still valid. Treadway understood from these conversations that CPC was going to honor the March 2009 agreement, but admits that no one other than Booker ever told him so. Booker, by contrast, remembers telling Treadway that CPC might use Treadway as an independent agent "after [Treadway] retired," but that Booker could not make any guarantees because CPC was in a period of transition after acquiring Progress. Booker asked Treadway to wait to discuss the "potential agency arrangement" until after CPC had hired someone to take over the Carolinas, and Treadway did not object. Treadway continued to service his interim sales territory.

After CPC acquired Progress's assets, CPC entered a transitional period that involved evaluating, reducing, and redistributing the existing sales territories of almost all the CPC salesmen. On September 9, 2009, Booker attended a transition meeting with Steven McMenamin, CPC's Chief Financial and Chief Operating Officer, Peter Longo, CPC's Chief Executive Officer, and Daniel Cohen, the Executive Vice President of California Paints, a division of CPC. Booker circulated his notes from that meeting via e-mail on September 14, 2009. In those notes, Booker lists Treadway's retirement as a key sales force issue, stating that Treadway "is slated to retire November 30, 2009" but "he would like to work as an independent agent" handling three Bahamas accounts and "accounts within an approximate 40 mile radius of Johnson City." Treadway's retirement "will necessitate needing to hire a replacement to travel portions of Virginia, Tennessee, and the Carolinas."

In early December 2009, Treadway called Booker to ask whether CPC had hired a new salesman for the Carolina territory. Booker said no, but assured Treadway that he would do so as soon as possible. Treadway then confirmed that he would continue working in 2010 under the same salary agreement as in 2009.

On December 13, 2009, Booker e-mailed McMenamin and Longo regarding their December 9, 2009 conversation about "John Treadway's impending retirement, his possible change in status from employee to independent agent, and the future of the Carolinas territory." To this e-mail, Booker attached Version 1 ("semi-retire") of the March 9, 2009 agreement, referring to it as "the deal I made John last March." Booker noted that Treadway had "agreed to remain an employee and continue his current duties until we make some other arrangement."

No new sales employee was hired in 2010 to assume responsibility for any of Treadway's territory. On June 9, 2010, Cohen e-mailed Longo and McMenamin his recommended changes to the existing sales

territories. His proposal for the South Atlantic Market was based on the assumption that Treadway would soon retire. Cohen recommended that Jim Turmelle, a Regional Sales Manager who was already servicing some accounts in Bermuda, receive Progress training and take over "the offshore business for Progress including the Bahamas". He also recommended a new hire to "manage and grow VA, NC and SC."

Cohen then sent Booker an e-mail on June 15, 2010 asking for Booker's feedback on "the Midwest territories". Cohen also wanted Booker's thoughts on giving Turmelle responsibility for Kelly's Home Center, a Bahamas account, "when Treadway retires." Cohen wanted to create a plan for "a one[-]time territory change" because "[i]t makes it easy for compensation and responsibility assignments."

Booker e-mailed a counter-proposal for reorganizing the existing sales territories to McMenamin, Longo, and Cohen on October 28, 2010. Booker's plan, dated October 27, 2010, addressed "the sales opportunity in the southern U.S., consolidating territories in the upper Midwest, replacing John Treadway in Virginia and the Carolinas, and providing sales coverage to develop new, and service existing, Bahamas accounts." In the plan, Booker stated that "John Treadway will retire at the end of 2010." The plan established February 15, 2011 as the "target date" for hiring a new sales employee to cover Treadway's Carolinas and Virginia territories. With respect to the Bahamas accounts, the plan allowed Treadway to represent CPC as an independent agent indefinitely.

In December 2010, Booker and Treadway exchanged e-mails regarding Treadway's compensation plan. On December 27, 2010, Booker e-mailed Treadway a copy of Version 2 ("assumes you retire") of the March 9, 2009 agreement ("the attached memo"), and noted that because Treadway did not transition "from employee to agent" in 2010, CPC "continued with the same compensation program" as the previous year and was "willing to continue with the present arrangement until such time that we have a new hire" so long as Treadway was also "willing to continue as such." Booker assured Treadway that CPC was "actively talking with a Carolina territory candidate." Treadway responded that he had "no problem to continue working until you hire the person for my territory."

Although Treadway had again agreed to continue servicing his sales territory, he continually phoned Booker throughout 2010 and 2011 to ask whether and when a new sales employee would be hired to take over his Carolina and Virginia sales territories. Treadway felt that Booker was procrastinating and had "made up various excuses" for not hiring a new sales employee. Treadway was having difficulty servicing all his accounts because "[y]ou just can't do your job going into four states," and referred two potential candidates for the Carolinas and Virginia accounts to Booker. In March 2011, Booker interviewed the candidates Treadway referred, but did not hire either one because he "did not think any of the candidates was a good fit for the position."

Between May and September 2011, Booker interviewed potential candidates for a sales position. In early October 2011, Booker offered David Boepple a sales position. Boepple was 57 years old when he was hired by CPC at a base salary of $70,000. Boepple's hiring and salary were approved by McMenamin, who valued Boepple's "extensive product and industry experience," his "marketing background that differentiated him and gave him an advantage over other salesmen," and the fact that Boepple "had held several prominent positions at established paint and

hardware companies prior to applying to CPC."

Boepple officially began working for CPC on October 24, 2011. Booker spoke to McMenamin "[t]en days before Boepple's hire," or on October 14, 2011, about "the possibility of Treadway working as an agent for CPC in the Caribbean" once a new sales employee was in place. McMenamin rejected hiring Treadway as an independent agent in favor of using Turmelle. According to McMenamin, Turmelle was preferable over an independent agent arrangement with Treadway because Turmelle was already servicing accounts in Bermuda and CPC "would not incur any additional cost by having Turmelle cover the rest of the region."

Booker phoned Treadway on October 17, 2011 to inform him of Boepple's hire and asked Treadway to introduce Boepple to Treadway's clients in the Carolinas and to introduce Lloyd to Treadway's clients in Virginia. Booker also informed Treadway that CPC had decided not to retain him as an independent agent because there was an existing employee who could cover the Bahamas accounts without additional cost to CPC. Treadway became upset, and Booker asked Treadway for "a specific sales and prospecting plan for generating new business in the Caribbean" that Booker could present to CPC in support of another attempt to convince CPC "to use Treadway as an agent in the region." Treadway "sent the prospective Caribbean accounts information" to Booker on November 11, 2011 in anticipation of "being assigned to work the Caribbean area."

On November 14, 2011, after sending Treadway's plan to McMenamin, Longo, and Cohen for their review, Booker e-mailed Treadway a copy of his proposed Caribbean business development plan. In his plan, Booker notes that Boepple was hired "to replace John Treadway in the Carolinas, with the transition to be completed by mid-December." Booker states, however, that he "would like to have a final discussion" with everyone regarding the "current plan" calling for "John to retire and Jim Turmelle to assume responsibilities" for the Bahamas accounts. Booker favored using Treadway as an independent agent and wanted "to fully vet the idea of retaining John" one last time by laying out "the opportunities, costs and issues" before CPC moved "in any final direction." Treadway did not object to any language in Booker's plan.

During November and December 2011, while Booker's Caribbean business plan was under consideration, Treadway introduced Boepple and Lloyd to his clients in the Carolinas and all but one of his Virginia clients. Lloyd also took over some Tennessee accounts from Treadway. According to CPC records, Boepple and Lloyd assumed official responsibility for those accounts on November 1, 2011. Lloyd's territory now included approximately 51 accounts in Tennessee and 23 accounts in Virginia, as well as some accounts in North Carolina. Boepple's territory included most of the accounts in North and South Carolina and three accounts in Virginia. Treadway's sales territory had thus been reduced to three accounts in the Bahamas, 12 accounts in Tennessee, and one account in Virginia. Booker expected Treadway to retire once these transitions were finished.

CPC continued to rearrange its sales territories, and hired Bryan Bonsal in early 2012 as a salesman for some accounts in Virginia and Maryland. Bonsal's official start date was March 1, 2012. Bonsal was 41 years old and earned a base salary of $65,000 a year. As of March 1, 2012, Bonsal had assumed responsibility for two accounts in Virginia and four accounts in Maryland that had been serviced exclu-

sively by salesman Damien Mauro. By December 31, 2012, Bonsal added approximately 30 accounts in Virginia and North Carolina to his territory that had, at one time or another, been serviced by Treadway. None of these accounts, however, had been Treadway's responsibility since 2009 and they were all being serviced by other sales employees when Bonsal was hired.

In December 2011, McMenamin rejected Booker's proposed Caribbean business plan that would have retained Treadway as an independent agent. For McMenamin, it was still more cost effective to have an existing sales employee, Turmelle, assume responsibility for the Bahamas accounts than to pay Treadway to be an agent in that region. Longo and Cohen rejected the proposal for these same reasons.

Booker informed Treadway of the decision on December 9, 2011. Treadway responded that he had a contract with CPC that was supposed to go into effect "once the salesman was hired," and he was not going to retire or resign. At his deposition, Treadway agreed that he would have "retired, semi-retired, quit, resigned, whatever you want to call it, as an employee" had CPC agreed to make him an independent agent in the Bahamas.

When Treadway refused to resign, McMenamin decided to terminate Treadway but agreed to process Treadway's separation as a position elimination "so that [Treadway] could collect unemployment." Booker maintains that he told Treadway of the decision on December 22, 2011, and that the decision was effective December 31, 2011. Treadway does not recall speaking with Booker until January 2012, but does recall receiving a letter "[d]uring the Holidays" dated December 22, 2011 stating that his retirement from CPC was effective December 31, 2011. In response, Treadway called human resources, asserting that he had not resigned or retired.

Treadway then received a second letter, also dated December 22, 2011, stating that Treadway's official termination date will be effective December 31, 2011 "due to job elimination." Treadway was 69 years old and earned a base salary of $48,000.

## II.

Treadway sued CPC on April 28, 2013 in the Eastern District of Tennessee. On July 28, 2014, CPC moved for summary judgment on Treadway's ADEA claim. The district court granted CPC's motion and dismissed the case on January 5, 2015. Treadway then filed a motion to alter or amend judgment, which was denied on June 8, 2015. This appeal followed.

While we usually review the denial of a motion to alter or amend judgment under an abuse of discretion standard, we apply a *de novo* standard of review where, as here, the appellant appeals the denial of a Rule 59(e) motion that seeks review of a grant of summary judgment. *Smith v. Wal–Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999). Summary judgment is appropriate if, viewing the facts and reasonable inferences in the light most favorable to the non-moving party, there is no genuine dispute of material fact for trial. Fed. R. Civ. P. 56(a); *Cass v. City of Dayton*, 770 F.3d 368, 373 (6th Cir. 2014).

## III.

The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from making adverse employment decisions because of an employee's age. 29 U.S.C. § 623(a). Age discrimination can be proven with direct or circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Where the claimant lacks direct evidence of age discrimination, we apply the *McDonnell Douglas* burden-shifting framework under which a

claimant must establish a *prima facie* case of discrimination. *Id.* at 620–23.

Treadway sees this as a direct-evidence case. He believes that CPC's "repeated use of the words 'retire' and 'retirement' with regard to their plans for [Treadway's] employment constitutes direct evidence of age discrimination" because these terms "carry the explicit connotation of advancing age." We disagree.

The standard for establishing direct evidence of discrimination is high. Direct evidence requires no inference to prove the existence of a fact while circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted). In the context of age discrimination, " '[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criter[ion]." *Scott v. Potter,* 182 Fed.Appx. 521, 526 (6th Cir. 2006) (quoting *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989)).

Treadway does not claim that anyone at CPC ever made any reference to his age, either in person or in a document. (R. 32-2, ID 319–21, 324.) At his deposition, Treadway admitted that he has no "written or oral evidence" showing that he was fired because of his age and states that he has no idea why he was fired. (R. 32-2, ID 324–25.) He speculates, however, that CPC must have "had a plan to get rid of" him, "the oldest salesperson up there," because of "those documents" in which CPC is "talking about retiring [Treadway] constantly."

The terms "retire" and "retirement" alone, without any evidence that they are being used as a proxy for age to express discriminatory bias, are not direct evidence of age discrimination. *See, e.g., Hale v. ABF Freight Sys., Inc.,* 503 Fed.Appx. 323, 331 (6th Cir. 2012) (retirement alone insufficient, claimant's age must be "unequivocally link[ed]" to termination decision); *Lefevers v. GAF Fiberglass Corp.,* 667 F.3d 721, 724 (6th Cir. 2012) ("questions concerning an employee's retirement plans do not alone constitute direct evidence of age discrimination"; general statements about an employee's age and impending retirement are not direct evidence because they are not linked to the termination decision); *Scott,* 182 Fed.Appx. at 526–27 ("Why don't you retire and make everybody happy?" is not direct evidence of age discrimination where there is no evidence that term was used as a proxy for "too old" or some other derogatory, age-based term).

There is no evidence that any of CPC's representatives used the words "retire," "semi-retire," or "retirement" to mean that Treadway was too old to do the job. Treadway's personal belief to the contrary is not enough to compel a different conclusion. *See Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 268 (6th Cir. 1986) ("personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination."). Treadway must make his case against CPC with circumstantial evidence; we will therefore apply the *McDonnell Douglas* burden-shifting framework.

To establish a *prima facie* claim of age discrimination using circumstantial evidence, Treadway must show, by a preponderance of the evidence: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Treadway can establish the fourth element by showing either that a substan-

tially younger person replaced him, or that he was treated differently than similarly situated, non-protected employees. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008).

CPC disputes the fourth element of Treadway's *prima facie* case. Treadway argues that he was replaced by four younger salesmen who split his sales territory: David Lloyd, Jim Turmelle, David Boepple, and Bryan Bonsal. In support of this assertion, Treadway emphasizes the younger ages of these salesmen as well as Booker's use of the terms "replacement" and "replace" in documents referencing Boepple's hiring. The district court disagreed, but still undertook the pretext analysis and found that, even if Treadway had established a *prima facie* case, he could not establish that CPC's proffered reasons for firing him were pretext for age discrimination.

We recognize that the burden of establishing a *prima facie* case is "not onerous". *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Even assuming that Treadway established a *prima facie* case, however, we nonetheless affirm because Treadway has not raised a genuine dispute of material fact as to pretext.

## IV.

Because we assume, without deciding, that Treadway has established a *prima facie* case of age discrimination, the burden of production shifts to CPC to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

█ CPC states that it declined to retain Treadway as an independent sales agent and ultimately eliminated Treadway's position to save money, a legitimate, non-discriminatory reason. CPC asserts that it was always operating under the "shared assumptions" established in the March 9, 2009 agreement that "Treadway would leave his employment once CPC hired a salesman for the Carolinas" and that "Treadway wanted to work as an agent in the Caribbean and within 40 miles of his home after he left." After Boepple was hired to cover the Carolinas in October 2011, CPC had Treadway transition his Carolinas accounts over to Boepple and his Virginia accounts over to Lloyd.

At that point, Treadway's sales territory had been significantly reduced—as he had been requesting since 2009—and CPC anticipated that he would resign. When Treadway refused because he was not made an independent agent as he had been anticipating, CPC decided to have existing employees absorb the few remaining Treadway accounts rather than pay Treadway to cover them at full salary. Cost savings also motivated CPC's decision to reject using Treadway as an independent sales agent—CPC determined that it would be more cost-effective to have Turmelle take over the Bahamas accounts because he was a regional sales manager already servicing clients in nearby Bermuda.

Because CPC has articulated a legitimate, non-discriminatory reason for its actions, the burden of production shifts back to Treadway to demonstrate that this reason is mere pretext for age discrimination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). Although the burden of production shifts between the parties, the burden of persuasion is always with Treadway to demonstrate "that age was the 'but-for' cause of [his] employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).

To survive CPC's motion for summary judgment, Treadway ."must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011). Treadway can show pretext by establishing that CPC's reason: (1) had no basis in fact; (2) did not actually motivate its actions; or (3) was insufficient to motivate its actions. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

We apply a modified version of the "honest belief" rule with regard to pretext. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Under this rule, Treadway "must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). To show that the proffered reason for its action is "honestly held," CPC "must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith*, 155 F.3d at 807. Treadway, in turn, "must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is 'too obvious to be unintentional.'" *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) (quoting *Smith*, 155 F.3d at 807). Ultimately, however, pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

█ Treadway has not presented sufficient evidence to create a genuine dispute of material fact as to whether CPC's proffered reason is pretextual and not "honestly held." Treadway argues that CPC's use of the terms "retire" and "retirement" in internal e-mails and documents, CPC's replacement of Treadway with younger salesmen at higher salaries, CPC's lack of transparency and candor about its plan to retire Treadway, and the allegedly fraudulent alteration of the March 9, 2009 agreement (evidenced by the two existing versions) all represent circumstantial evidence of CPC's "mendacity," "pretext," and "age discrimination" that should be submitted to a jury.

The district court correctly held that this evidence is insufficient, even in combination, to create a genuine issue of fact on the question of pretext. As discussed above in section III, there is no evidence indicating or even suggesting that the use of "retire" and "retirement" in internal e-mails and other documentation masked a discriminatory motive on the part of anyone at CPC. These terms were never used in conjunction with other language suggesting discriminatory animus – Treadway does not claim that anyone ever referred to his age or years of service, or even suggested that he retire. It was Treadway who wanted to reduce his sales territory and eventually go from being a CPC employee to an independent sales agent responsible for a small number of accounts— Booker and others at CPC used the terms "retire," "semi-retire," and "retirement" to refer to this plan. Without more, these references to retirement do not create a genuine issue of material fact regarding whether CPC's proffered reason for its actions is merely a pretext.

Treadway also argues that CPC cannot claim to be saving money by terminating him because he was replaced by Boepple and Bonsal, two younger salesmen who were paid higher salaries. While Treadway was paid $48,000 a year, Boepple's starting salary was $70,000, and Bonsal's was $65,000, or a combined $135,000. Treadway argues that these new hires lacked his

experience with CPC products and "had to be trained."

The district court was correct to reject Treadway's salary comparison as evidence of pretext, because he did not "address possible differences in experience, skill, and workload between himself and the other two salesmen." When he was hired in March 2012, Bonsal assumed responsibility for two accounts in Virginia and four accounts in Maryland that had been serviced exclusively by salesman Damien Mauro. Bonsal did take over some former Treadway accounts in December 2012, but none of these had been serviced by Treadway since 2009 and were all being serviced by other sales employees when Bonsal was hired.

Boepple, meanwhile, did take over the Carolinas accounts directly from Treadway, but Treadway had been asking Booker to hire someone to cover this territory for years. Moreover, in addition to the Carolinas accounts, Boepple also assumed responsibility for some of Mauro's accounts and for Lloyd's task of developing business in part of South Carolina. Finally, McMenamin states without refutation that he paid Boepple $70,000 a year because of his "extensive product and industry experience," his "marketing background that differentiated him and gave him an advantage over other salesmen," and the fact that Boepple "had held several prominent positions at established paint and hardware companies prior to applying to CPC."

CPC maintains that terminating Treadway and allowing existing employees to absorb his few remaining accounts at no cost was much more cost-effective than paying Treadway $48,000 a year to continue servicing them. These hiring and salary decisions may or may not make good business sense, but Treadway cannot establish pretext simply by questioning CPC's business judgment. This court is not a "super

personnel department" tasked with "second guessing employers' business decisions." *Carter v. Toyota Tsusho Am., Inc.*, 529 Fed.Appx. 601, 611 (6th Cir. 2013); *see also Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004). The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions but only from decisions that are unlawfully motivated—and Treadway has not presented sufficient evidence linking CPC's salary determinations with respect to Boepple and Bonsal to discriminatory animus toward Treadway because of his age.

Finally, Treadway alleges that CPC deliberately misled Treadway about its "corporate plan" to retire him. Treadway points to CPC's use of "retirement phraseology" in internal documents, its hiring of Boepple and Bonsal, its request that Treadway transition his Carolinas accounts to Boepple, Booker's request for a list of prospective Caribbean clients, and CPC's refusal to make him an independent agent once these tasks were accomplished as evidence of CPC's "mendacity and duplicity." Treadway also refers to certain "deliberately misleading" remarks about his future with CPC that CPC executives Cohen and Leven made to clients and the existence of two versions of the March 2009 agreement as more of the same.

Taken together, this evidence indicates that, at most, some decision-makers at CPC treated Treadway unfairly, but it does not establish that its proffered reason for terminating Treadway is a pretext for age discrimination. The use of "retirement phraseology" and the hiring and salary determinations made with respect to Boepple and Bonsal have already been addressed. As for facilitating Boepple's takeover of the Carolinas territory, Treadway no longer wanted to service those accounts

and had been asking for a replacement for years. Moreover, although Treadway gave Booker a list of potential Caribbean accounts upon request, Booker did not use this information to show that Treadway was too old and should be retired. Instead, Booker included this information in a business proposal advocating that Treadway be retained as an independent agent, arguing that there were many good prospects for new business that Treadway cultivated and that Treadway had "a safe relationship" with an important Bahamas account.

As for the comments allegedly made by CPC executives Cohen and Leven to Bahamian clients about seeing more of Treadway in the future, Treadway believes that these comments were misleading because neither Cohen nor Leven told him that CPC was in fact planning to retire him. These comments, however, were allegedly made approximately a year before Treadway was terminated, were not stated as promises to Treadway, and were not related to the decision-making process that resulted in Treadway's termination. Even if such comments were misleading, they are not evidence of pretext.

There is no dispute that, for whatever reason, two slightly different versions of the March 9, 2009 agreement exist. CPC has not tried to obscure this fact and provided both versions to the district court. The district court made clear that it was aware of the difference, and the different terms were immaterial to its decision. Indeed, whether Treadway preferred to use the term "semi-retire" or "retire" to refer to his transition from employee to independent agent, the practical result, as Treadway himself admits, is his separation from CPC as a full-time employee. The mere existence of two versions of a document with minor differences, without more, does not support Treadway's allegations of a conspiratorial plan to fire him because he

was the oldest salesman, nor does it establish that one of the versions is fraudulent.

Treadway knew, having negotiated the March 9, 2009 agreement for his own benefit, that a salesperson would be hired to relieve him of the Carolinas accounts and that his sales territory would be significantly reduced. Treadway was also aware, having seen Booker's Caribbean business development plan, that CPC assumed Treadway would retire once Boepple was hired, and that Turmelle would "assume responsibilities" for the Bahamas accounts. Treadway cannot sustain the argument that CPC decision-makers were secretly conspiring to fire him because he was too old when he was shown, and did not object to, at least two documents revealing the details of this plan before it was fully executed, neither of which refers to Treadway's age or years of service in any way.

Treadway has not created a genuine issue of material fact that CPC's proffered reason for its actions was not based in fact, or that it did not actually motivate its actions. What is ultimately fatal to Treadway's claim, however, is that Treadway himself initiated and impelled the chain of decisions he now claims was motivated by discriminatory animus on the part of CPC decision-makers. Treadway proactively reached out to Booker in 2009 and asked to reduce his sales territory because he was getting older and needed to "slow down." Together, Booker and Treadway negotiated the terms of the March 9, 2009 agreement which, under either version of the document, establish that Treadway's sales territory would temporarily increase until a new salesman could be hired to cover the Carolinas, and that Treadway would then separate from CPC ("go from Company employee") to become an independent sales agent handling only three accounts in the Bahamas and those existing accounts within a 40-mile radius of his

home in Johnson City, Tennessee. CPC executives, including Booker, used the terms "retire" and "retirement" to refer to this plan.

When the transition from Progress to CPC slowed the process of hiring a new salesman, Treadway called Booker throughout 2010 and 2011 to ask when someone would be hired, and even referred two potential candidates to Booker in an effort to expedite the hiring process. After CPC hired Boepple and he assumed responsibility for the Carolinas, CPC decided not to retain Treadway as an independent agent or continue to pay him a full salary to service his few remaining accounts. Treadway now argues that these decisions were made because of his age, but no reasonable jury could infer such a discriminatory animus from CPC decisions that were prompted by Treadway himself.

## V.

Whether some CPC executives—with the exception of Booker—treated Treadway unfairly may be a legitimate question on this record. Treadway, however, alleges employment discrimination based on his age. Because Treadway did not provide evidence sufficient to create a genuine issue of material fact as to whether CPC's business rationale for terminating him was a pretext for age discrimination, we **AFFIRM** the district court's grant of summary judgment.